# United States Court of Appeals
# for the Federal Circuit

---

**NEGAR HESSAMI,**
*Petitioner*

**v.**

**MERIT SYSTEMS PROTECTION BOARD,**
*Respondent*

---

2019-2291

---

Petition for review of the Merit Systems Protection Board in No. PH-1221-17-0271-W-2.

---

Decided: November 9, 2020

---

KELLEE BOULAIS KRUSE, The Employment Law Group, Washington, DC, argued for petitioner. Also represented by ROBERT SCOTT OSWALD.

JEFFREY GAUGER, Office of General Counsel, United States Merit Systems Protection Board, Washington, DC, argued for respondent. Also represented by KATHERINE MICHELLE SMITH, TRISTAN LEAVITT.

---

Before NEWMAN, REYNA, and STOLL, *Circuit Judges*.

REYNA, *Circuit Judge*.

The petitioner, Dr. Negar Hessami, a former Chief of Pharmacy for a Department of Veterans Affairs medical center, challenges the Merit Systems Protection Board's dismissal of her whistleblower appeal for lack of jurisdiction. We hold that for purposes of the Board's jurisdiction under the Whistleblower Protection Act ("WPA"), when determining whether an appellant has non-frivolously alleged that she disclosed information that she reasonably believed evidenced misconduct under the statute, the Board's inquiry should be limited to evaluating whether the appellant has alleged sufficient factual matter, accepted as true, to state a claim that is plausible on its face. Because the Board erroneously relied on the testimony of agency witnesses in dismissing Dr. Hessami's appeal for lack of jurisdiction, we vacate and remand for further proceedings.

## BACKGROUND

Between 2012 and 2016, Dr. Hessami served as the Chief of Pharmacy at the VA Medical Center in Martinsburg, West Virginia ("the Center"). During that time, the first curative therapies for Hepatitis C Virus infection ("HCV") entered the market, and the Center grappled with the challenge of providing patients with access to the enormously expensive but life-saving new therapies. The new medications were funded through a budget assigned by the Regional Veteran Integrated Service Network ("VISN") specifically for HCV patients at the Center. Hessami Affidavit, J.A. 989–94 ("Aff."), ¶ 4. Along with the budget, the regional VISN provided treatment guidelines for administration of HCV therapies. *Id.* at ¶ 16. Dr. Hessami was responsible for overseeing the ordering and dispensing of the HCV medications at the Center. *Id.* at ¶ 19. As part of her role, she became familiar with HCV treatment guidelines, monitored all purchases of HCV medications, and provided weekly reports of purchases and relevant

treatment information to the VISN. *Id.* at ¶¶ 7–11. She also served as the pharmacy's point of contact for the regional VISN, and worked with the Center's Chief of Staff, Jonathan Fierer, and the Chief of Medicine, Deborah Bennett, to assemble a hepatitis interdisciplinary team ("HIT" or "IDT") that met weekly to coordinate the treatment of HCV patients at the facility. *Id.* at ¶¶ 5–6.

The first of the curative HCV medications, simeprevir and sofosbuvir, were approved by the FDA in 2013. These drugs, which were often prescribed together in a regimen referred to as "S&S," were priced at hundreds of dollars per pill. According to national guidelines and manufacturing prescribing information, the typical length of therapy was 12 weeks, but patients could be treated for longer periods under certain circumstances. *Id.* at ¶ 11. In the fall of 2014, two new combination therapies for the treatment of HCV were approved under the brand names Viekira and Harvoni. *Id.* at ¶ 15. The newer drugs were available to the Center at a fraction of the cost of S&S. The regional VISN pharmacy benefits manager recommended that all new patients be started on the new products rather than S&S beginning in January 2015. *Id.* at ¶¶ 37, 40.

## A. Whistleblower Disclosures

Between November 2014 and February 2015, Dr. Hessami on multiple occasions raised concerns about the prescribing practices of Dr. Trent Nichols, M.D., one of the physicians at the Center who treated HCV patients. According to Dr. Hessami, Dr. Nichols did not have any experience prescribing HCV drugs to patients before he began working at the Center around September of 2014. *Id.* at ¶¶ 17–18. Dr. Hessami raised concerns that Dr. Nichols was departing from the recommended treatment protocols by continuing to prescribe S&S when the guidelines recommended using the newer therapies, and by prescribing S&S to patients for longer than the typical 12-week course. *Id.* at ¶¶ 20–26, 28–30, 33–34, 38, 42–44. According to Dr.

Hessami, in multiple meetings, one-on-one discussions, and emails, she informed senior members of the clinical and financial staff at the VISN and at the Center that Dr. Nichols's treatment decisions were (1) unnecessarily exposing patients to increased risk of adverse drug reactions and side effects, and (2) overspending the Center's HCV funds. *Id.*

For example, Dr. Hessami alleges that during IDT meetings, she directly and publicly confronted Dr. Nichols and "asked that [he] at least justify why he was going beyond the length of treatment guidelines." *Id.* at ¶¶ 23, 43. Following one such meeting, she sent an email, dated February 17, 2015, to Dr. Bennett and several others regarding Dr. Nichols's decision to continue prescribing S&S to new patients. She explained that the VISN was "adamantly asking the facilities to start new patients on Harvoni or Viekira," and was "not funding [the Center] for the patients newly started on S&S." She further explained the financial consequences of Dr. Nichols's decisions:

> The cost of S&S drugs combined is ~$52,000.00 vs. for Viekira is ~$8,000.00 and Harvoni is ~$14,000.00 per month/per patient.

> Since the beginning of February, Dr. Nichols has started 4 patients on the old two drugs (S&S) for total cost of almost $208,000.00 that the medical center has to absorb since VISN is not reimbursing Martinsburg for the old drugs.

> Last Thursday, in our weekly meetings, I brought this issue to Dr. Nichols['s] attention again and yet he has started a new patient on S&S on Friday (02-13-2015). This is $52,000.00 that we are not going to get reimbursed for.

> I would like to humbly ask you to monitor his ordering practices regarding Hep C medications, which will compromise the reimbursement funds

and providing an excellent patient care that we all strive for.

J.A. 125. Dr. Bennett responded to the group that when Dr. Nichols had previously been asked not to start new patients on S&S, he had appeared to understand. She suggested that one option for addressing the problem was to ask Dr. Nichols to provide a written explanation for the new S&S prescriptions and another was to simply not fill the new prescriptions. She later informed the team that she had decided to block S&S prescriptions going forward and that any discussions regarding "necessity" would need to be discussed with her directly. J.A. 122–23.

In other emails and meetings, Dr. Hessami voiced more general concern that the Center was overspending on HCV medication, including that it had spent $9 million of its $13 million annual budget for HCV medication by January 2015. J.A. 9, 297–98. After one such meeting during which Dr. Hessami raised the issue, Dr. Fierer instructed her not to mention the $9 million publicly again. J.A. 10, 977.

Dr. Hessami alleges that she continued to voice her concerns throughout 2015 and that her comments were at times met with hostile, derogatory statements by Dr. Fierer. Aff. ¶ 29.

### B.  Suspension and Demotion

In late 2015, a pharmacy employee accused Dr. Hessami of misconduct, and Dr. Hessami was suspended and later demoted for charges of conduct unbecoming a supervisor. Following her demotion, Dr. Hessami filed a complaint with the Office of Special Counsel ("OSC") under the WPA alleging that she had been accused of wrongdoing and punished as reprisal for her protected disclosures regarding the agency's spending on HCV drugs. When OSC declined to take action, she filed an individual-right-of-action ("IRA") appeal to the Merit Systems Protection Board under 5 U.S.C. § 1221.

The VA moved to dismiss her appeal for lack of jurisdiction, asserting that Dr. Hessami had failed to adequately establish that she had made protected whistleblower disclosures pursuant to the Whistleblower Protection Enhancement Act ("WPEA").[1]  J.A. 39–42.  Because the parties had already completed discovery, the Agency set forth a statement of facts as part of its motion that cited to affidavits and deposition testimony from both parties' witnesses as well as documentary evidence.  *See* J.A. 33–38.

The Board granted the VA's motion to dismiss.  In its decision, the Board adopted many of the VA's proposed statements of fact, relying heavily on statements from Agency witnesses.  In particular, the opinion set forth the following representations from Dr. Bennett as "essentially undisputed":

- The appellant did not raise with [Dr. Bennett], nor was there ever a concern over, patient safety with Dr. Nichols's prescribing practices.

- Dr. Nichols's treatment plans were discussed with the HIT, wherein he would always present research and documentation to support his treatment approach; and the HIT always approved his treatment plans and medications chosen.

- With respect to length of treatment, only a small number of patients were extended beyond the typical course, but those cases presented complex

---

[1]    The WPA, effective since 1989, provides the general framework of the whistleblower protection process.  The WPEA of 2012 made certain amendments to the existing WPA framework regarding, as relevant to this case, the scope of protected disclosures and the definition of "personnel action."

clinical issues and Dr. Nichols looked at their clinical needs based on his long history and experience.

- Dr. Nichols monitored the patients' lab values, and all cases were presented, justified by research, and approved by the HIT.

- Dr. Nichols's treatment choices were recognized as a standard of care and cited in current literature sources.

- There were clinical reasons to support the use of the older drugs over the newer, less expensive drugs.

J.A. 6.

Based on the record evidence, the Board concluded that Dr. Hessami failed to make non-frivolous allegations of a violation of law, rule or regulation; or gross mismanagement, gross waste of funds, abuse of authority, or a substantial and specific danger to public health or safety. The Board found that Dr. Hessami's disclosures constituted mere disagreement over "fairly debatable" "questions of policy" and were thus "not the type of communications protected by the WPEA." J.A. 14–16. With respect to the waste of funds and danger to public health or safety factors, the Board found that Dr. Hessami had failed to explain why the expenditures she discussed were out of proportion to the expected benefits of the treatment and had further failed to identify any patients who were actually harmed by Dr. Nichols's prescribing practices. J.A. 13–14. On these grounds, the Board dismissed Dr. Hessami's appeal for lack of jurisdiction.

Dr. Hessami petitioned for review in this court. We have jurisdiction under 28 U.S.C. § 1295(a)(9).

## DISCUSSION

The Board has jurisdiction over an IRA appeal under the WPA, 5 U.S.C. § 1221, if the appellant has exhausted her administrative remedies before the OSC and makes

"non-frivolous allegations" that (1) she engaged in whistle-blowing activity by making a protected disclosure under 5 U.S.C. § 2302(b)(8), and (2) the disclosure was a contributing factor in the agency's decision to take or fail to take a personnel action. 5 U.S.C. § 1221; *Yunus v. Dep't of Veterans Affairs*, 242 F.3d 1367, 1371–72 (Fed. Cir. 2001). A protected disclosure under Section 2302(b)(8) is one which the employee "reasonably believes evidences (i) any violation of any law, rule, or regulation, or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety." 5 U.S.C § 2302(b)(8).

Dr. Hessami contends that the Board erred in crediting the agency's evidence against her in finding that she failed to make non-frivolous allegations of a protected disclosure. Whether the Board has jurisdiction over an appeal is a question of law we review de novo. *Forest v. Merit Sys. Prot. Bd.*, 47 F.3d 409, 410 (Fed. Cir. 1995).

### A.   Non-Frivolous Allegation

We first clarify the appropriate scope of the Board's inquiry when evaluating its jurisdiction over a whistleblower appeal. In *Spruill v. Merit Sys. Prot. Bd.*, this court held that the threshold question of whether an appellant has invoked the Board's jurisdiction should be assessed under a "non-frivolous allegation" standard analogous to the "well-pleaded complaint rule" used to evaluate federal question jurisdiction in federal court. 978 F.2d 679, 687–89 (Fed. Cir. 1992). We explained that "under the 'well-pleaded complaint rule,' whether a district court has federal-question jurisdiction over a claim 'must be determined from what necessarily appears in the plaintiff's statement of his own claim in the bill or declaration.'" *Id.* at 688 (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 809 (1988)).

Our subsequent cases have evaluated jurisdiction in whistleblower cases based on whether allegations were

facially sufficient. *See Johnston v. Merit Sys. Prot. Bd.*, 518 F.3d 905, 910 (Fed. Cir. 2008); *Yunus*, 242 F.3d at 1372. This court has consistently treated "a non-frivolous allegation" of an element as one that, "'if proven, can establish the Board's jurisdiction.'" *Cahill v. Merit Sys. Prot. Bd.*, 821 F.3d 1370, 1373 (Fed. Cir. 2016) (quoting *Garcia v. Dep't of Homeland Sec.*, 437 F.3d 1322, 1330 (Fed. Cir. 2006) (en banc)). Most recently, in *Piccolo v. Merit Sys. Prot. Bd.*, we stated that "at the jurisdictional stage, a petitioner need only assert non-frivolous allegations—allegations that are not 'vague, conclusory, or facially insufficient,' and that the petitioner 'reasonably believe[s]' to be true—of a protected disclosure that was a contributing factor to a reprisal." 869 F.3d 1369, 1371 (Fed. Cir. 2017) (quoting *Johnston*, 518 F.3d at 910). We held there that evidence concerning "a petitioner's credibility including . . . consideration of affidavits submitted by an allegedly retaliatory supervisor . . . 'relates to the merits of the claim'" rather than jurisdiction. *Piccolo*, 869 F.3d at 1371 (quoting *Johnston*, 518 F.3d at 911).

In 2015, the Board codified the non-frivolous allegation standard in its regulations at 5 C.F.R. §§ 1201.57(b) and 1201.4. *See* Practices and Procedures, 80 Fed. Reg. 4489 (Jan. 28, 2015). Section 1201.57(b) provides that an appellant who initiates a whistleblower appeal "must make non-frivolous allegations . . . with regard to the substantive jurisdictional elements"[2] of the appeal. 5 C.F.R. § 1201.57(b). Section 1201.4 defines a "nonfrivolous allegation" as "an assertion that, if proven, could establish the matter at issue" and specifies that "[a]n allegation generally will be considered nonfrivolous when, under oath or penalty of perjury, an individual makes an allegation that:

---

[2]    This excludes the non-merits elements of exhaustion and standing, which must be established by preponderance of the evidence.

(1) Is more than conclusory; (2) Is plausible on its face; and (3) Is material to the legal issues in the appeal." *Id.* at § 1201.4(s).

We recognize that this court has, on at least one occasion, analogized the standard for establishing non-frivolous allegations to the standard for summary judgment. *See Kahn v. Dep't of Justice*, 528 F.3d 1336, 1341 (Fed. Cir. 2008) ("The standard for determining whether non-frivolous disclosures exist 'is analogous to that for summary judgment.'" (quoting *Dorrall v. Dep't of the Army*, 301 F.3d 1375, 1380 (Fed. Cir. 2002))). We did not, however, actually apply the summary judgment standard to authorize jurisdictional dismissal of a whistleblower appeal based on evidence submitted by the agency. To the extent the "summary judgment" analogy suggests that such a dismissal would be proper, it is plainly contrary to both the Board's current regulations and our holding in *Spruill*.[3]

---

[3]    The "summary judgment" analogy in *Kahn* was borrowed from *Dorrall*, 301 F.3d at 1380, which turned on the question of constructive discharge, a question that we have since held to be subject to a "preponderance of evidence" test for jurisdictional purposes rather than non-frivolous allegations. *See Garcia,* 437 F.3d at 1325. Although in certain pre-*Spruill* cases, we approved of the Board's reliance on the agency's evidence in finding no jurisdiction, those cases involved direct appeals under 5 U.S.C. § 7513(d), where the threshold jurisdictional question was whether the employee suffered an appealable personnel action, a determination that is subject to the preponderance of the evidence standard. *See Manning v. Merit Sys. Prot. Bd.*, 742 F.2d 1424, 1428 (Fed. Cir. 1984) (relying on agency evidence in concluding that employee was not suspended for more than 14 days); *Wilson v. Merit Sys. Prot. Bd.*,

Permitting jurisdictional dismissal of an appeal based on a summary review of the evidence on the core merits issues would undermine Congress's express intent that the merits of employee appeals be resolved through a hearing rather than summary judgment. As we explained in *Crispin v. Dep't of Commerce*, Section 7701 expressly provides that in any appeal to the Board, "[a]n appellant shall have the right to a hearing for which a transcript will be kept," and the legislative history made clear that the provision was meant to bar summary judgment. 732 F.2d 919, 922 (Fed. Cir. 1984) (citing 5 U.S.C. § 7701(a)(1); H.R. REP. No. 95–1717, at 137 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2860, 2871). Thus, this court held in *Crispin* that even when the documentary record clearly supports judgment for the agency, the appellant is nonetheless entitled to a hearing on the merits as a matter of statutory right.[4] *Crispin*, 732 F.2d at 922. A summary judgment standard for "non-frivolous allegations" would allow the agency to circumvent that rule and obtain the equivalent of summary judgment on the merits by merely framing its motion as one for jurisdictional dismissal.

We thus clarify and hold that when evaluating the Board's jurisdiction over a whistleblower action, the question of whether the appellant has non-frivolously alleged protected disclosures that contributed to a personnel action

---

807 F.2d 1577, 1583 (Fed. Cir. 1986) (relying on agency evidence in concluding that employee had not been reduced in grade).

[4]    The Board, in recognition of our holdings, declined to promulgate a process for summary judgment. Practices and Procedures, 77 Fed. Reg. 62350, 62352 (Oct. 12, 2012) (rejecting suggestion to create summary judgment proceedings because "[t]he Court of Appeals for the Federal Circuit has found that the MSPB lacks authority to order summary judgment.").

must be determined based on whether the employee alleged sufficient factual matter, accepted as true, to state a claim that is plausible on its face.[5]  The Board may not deny jurisdiction by crediting the agency's interpretation of the evidence as to whether the alleged disclosures fell within the protected categories or whether the disclosures were a contributing factor to an adverse personnel action.

With these principles in mind, we turn to the allegations in this case.

## B.  Protected Disclosures

Fairly construed, the crux of Dr. Hessami's allegations is that a VA physician, Dr. Nichols, was prescribing the more expensive S&S regimen to patients rather than the substantially less expensive alternatives, Harvoni and Viekiri, and he was prescribing S&S to patients for substantially longer courses of treatment than necessary or recommended.  She alleges that she was knowledgeable about the local and national HCV treatment guidelines, and that Dr. Nichols's prescription practices were contrary to those guidelines.  She alleges that the extended treatment exposed patients to substantially increased exposure

---

[5]  It does not follow from this, however, that the Board is restricted to considering these allegations in a vacuum.  As the Supreme Court has explained regarding the analogous well-pleaded complaint rule, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  And, consistent with that analogous rule, the Board may also consider sources such as "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *See A & D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1147 (Fed. Cir. 2014).

to adverse drug reactions and side effects for patients and that Dr. Nichols's choice of drugs and duration of therapy resulted in hundreds of thousands of dollars in excess costs for the Center. We can infer from her allegations that at the time Dr. Hessami made her disclosures, she believed, as she suggested to others, that Dr. Nichols's decisions to depart from treatment guidelines were not otherwise justified. This is supported by her allegations that she confronted Dr. Nichols during meetings to ask him to justify his prescribing practices, and that afterwards, Dr. Bennett felt it was appropriate to block all prescriptions of S&S and to require Dr. Nichols to justify his prescription decisions in writing. *See Cahill*, 821 F.3d at 1373–74 (reading allegations "with an eye on likely inferences appropriate to the context" in assessing whether they were non-frivolous and plausible).

These allegations are "non-frivolous" within the meaning of 5 C.F.R. § 1201.4. They were made "under oath" in Dr. Hessami's affidavit. They describe a "facially plausible" series of events. They are not merely "conclusory" because they set forth specific facts supporting Dr. Hessami's beliefs of wrongdoing.

The allegations are also "material" because, if accepted as true, they are sufficient to support a reasonable belief of gross waste, gross mismanagement, and danger to public health. Specifically, assuming that Dr. Hessami's allegations reflect the facts reasonably known to her at the time she made her disclosures, a person in her position could reasonably believe that the additional cost of the therapy prescribed by Dr. Nichols constituted gross waste because it was significantly out of proportion to the additional "benefit reasonably expected to accrue to the government." *See, e.g., Chambers v. Dep't of Interior*, 515 F.3d 1362, 1366 (Fed. Cir. 2008). We assume, as we must at this stage, that Dr. Hessami reasonably believed that Dr. Nichols failed to provide clinical justification for his prescribing decisions.

A reasonable person could also conclude that the same prescribing practice constituted gross mismanagement because the unjustified higher cost of the therapies was likely to have a substantial detrimental impact on the Center's ability to complete its mission of providing care to HCV patients because the prescriptions were rapidly depleting the Center's HCV budget. *See Wen Chiann Yeh v. Merit Sys. Prot. Bd.*, 527 F. App'x 896, 900 (Fed. Cir. 2013). This belief could be reasonable even if it was eventually confirmed that the Center would be able to secure additional funding.

Similarly, if we accept as true Dr. Hessami's allegation that Dr. Nichols was prescribing S&S to patients for longer than their recommended durations without clinical justification for doing so, a reasonable person in Dr. Hessami's position could conclude that those prescriptions created a substantial and significant danger to public health. The mere fact that the prescription policy for HCV treatments was heavily debated does not strip whistleblower protection from disclosures about specific prescription decisions that the whistleblower reasonably believes endangered patients. *See Chambers*, 515 F.3d at 1368 ("[G]eneral criticism by an employee of the Environmental Protection Agency that the Agency is not doing enough to protect the environment would not be protected under this subsection. However, an allegation by a Nuclear Regulatory Commission engineer that the cooling system of a nuclear reactor is inadequate would fall within the whistle blower protections." (quoting S. REP. NO. 95–969, at 21 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 2723, 2744)). Here, Dr. Hessami's allegations amount to more than a general assertion that the VA is neglecting the health of its HCV patients. Even if she is unable to identify specific patients who were harmed, the allegation that a specific government physician is directing patients to take medications with known risks and side effects for an unnecessarily long period of time, paired with her reasonable belief that there was no clinical justification for doing so, does not represent

a "negligible, remote, or ill-defined peril that does not involve any particular person, place, or thing, is not protected." *Chambers*, 515 F.3d at 1368–69 (citation omitted). At the jurisdictional stage, the allegations have sufficient specificity and substantiality to support a reasonable belief that Dr. Nichols's prescribing practices constituted a substantial and specific danger to public health.

In concluding that Dr. Hessami's disclosures were not entitled to protection, the Board found that the substance of the disclosures constituted "disagreement over questions of policy" and "evidence of robust debate on how effectiveness of the Hep[atitis] C care should be measured and how disputes concerning such treatment should be managed." J.A. 14. However, in enacting the WPEA in 2012, Congress made clear that policy decisions and disclosable misconduct under the WPA are not mutually exclusive. *See* S. REP. NO. 112–155, at 7–8 (2012), *as reprinted in* 2012 U.S.C.C.A.N. 589, 595–96. The fact that there was an ongoing debate about the most effective and efficient means for providing HCV care to patients does not exclude allegations of misconduct about such care from whistleblower protection.

In finding that the substance of Dr. Hessami's allegations could not amount to misconduct, the Board assumed, based on the testimony of agency witnesses as cited in the opinion, that Dr. Nichols's prescribing choices were clinically justified, and that this should have been known to Dr. Hessami. That assumption was impermissible at the stage of the proceedings, where the question is the sufficiency of Dr. Hessami's allegations to invoke the Board's jurisdiction. Regardless of whether the agency may ultimately prove on the merits that Dr. Nichols's prescribing decisions were discernibly reasonable, Dr. Hessami has adequately alleged a reasonable belief that they were not. The issue should therefore be resolved at a hearing.

For these reasons, the Board erred in dismissing Dr. Hessami's appeal for failure to allege protected disclosures as to gross mismanagement, a gross waste of funds, and a substantial and specific danger to public health.[6]  We therefore vacate the Board's dismissal and remand for further proceedings.

## C.   Contributing Factor in Personnel Action

To establish jurisdiction, an appellant must establish not only that she exhausted her administrative remedies and made protected disclosures, but also that the disclosures were a contributing factor in a "personnel action" within the scope of the WPEA.  Because the Board dismissed Dr. Hessami's appeal based on failure to allege protected disclosures, the Board did not reach whether she had sufficiently alleged contribution to a personnel action. Because neither the Board nor the VA provided any reasoning for why Dr. Hessami's allegations are inadequate to show that her disclosures contributed to her demotion or that her demotion constituted a personnel action, we are unable to make that determination in the first instance based on the record before us.  Thus, on remand, the Board should evaluate the remaining substantive element for WPA jurisdiction before proceeding with a hearing on the merits.

---

[6]   We agree with the Board that Dr. Hessami made no specific allegation for why she reasonably believed that her disclosures evidenced a violation of law, rule, or regulation.  Even on appeal, she fails to raise any colorable argument for why Dr. Nichols's departure from treatment guidelines would constitute a violation of law, and she points to no other sources of law that were violated by the conduct she disclosed.

CONCLUSION

For the reasons discussed, we conclude that Dr. Hessami made non-frivolous allegations that she made disclosures she reasonably believed evidenced gross mismanagement, a gross waste of funds, and a substantial and specific danger to public health. We thus vacate the Board's dismissal of Dr. Hessami's appeal and remand for the Board to assess in the first instance whether she non-frivolously alleged that her disclosures were a contributing factor to a personnel action against her, so as to invoke the Board's jurisdiction. If her allegations are adequate in this regard, then the Board must provide her with a hearing on the merits of her claim.

**VACATED AND REMANDED**

COSTS

Costs to petitioner.